May it please the Court. My name is Curtis Zahn. I'm here from Educational Credit Management Corporation. Just last year, this Court reiterated the incredibly high standard for discharge of student loans when it stated that a debtor must prove insurmountable barriers to repayment of the student loan debt before it can be discharged. This echoes what the Brunner Court and other circuits have said when they said there must be a certainty of hopelessness. And whether you use the terms insurmountable barriers or certainty of hopelessness, the point is clear. The debtor must prove there is the lack of possibility of repayment of the student loan before it can be discharged. Now, some courts have considered this standard somewhat harsh or draconian, and they've attempted to lower this standard by either comparing the debtor's standard of living to an average standard of living, as opposed to a minimal standard of living, or they've shifted the burden from the debtor, who must prove insurmountable barriers or a certainty of hopelessness or a certainty of nonpayment, to the creditor to prove a certainty of payment. What are you saying happened here? And that's exactly what happened here, Your Honor. I think it's clear from the opinion that the Court compared the mandigome's standard of living to an average standard of living and shifted the burden to the creditor to prove the certainty of payment in the future. And I think that error occurs because of a fundamental misunderstanding of the student loan program and, more importantly, a fundamental misunderstanding of the nature of the action itself. First, student loans. Student loans are a social program. The purpose of the program is to provide access to individuals who otherwise would be unable to have the education of their choosing. Student loans are given without normal market considerations at terms that are far better. I think we're all quite familiar with student loans. One of the really important things about student loans, Your Honor, is that because of the nature of them, Congress has enacted a quid pro quo. It said that students cannot discharge loans in all but the most exceptional circumstances where they cannot prove the probability of repayment. What are we supposed to do? I mean, you have a bankruptcy court who went through this pretty carefully. So you're asking us to do what? I'm asking this Court to reverse the dischargeability of the loans. And I think the reason for that … Substitute our judgment as to the feasibility of what you argued for and what they argued for? Not to substitute your judgment. As this Court is well aware, the standard review for student loan cases is de novo. Undue hardship is a legal standard. And while this Court must take the findings of fact and are clearly erroneous in our view, the ultimate conclusion is something that this Court reviews de novo. It would be helpful to me if you could sort of sharpen the focus. Could you give – pick out your example of where things went astray. I was having trouble. If you look at the … You're talking about the commute time, and I'm trying to do the numbers on it and trying to figure out how I would have come out differently. Well, and I guess that's the point, Your Honor, is that the burden of proof is on the debtor to prove a certainty of hopeless or insurmountable barrier. So things like … But where do you get the idea – you're talking about the minimal standard of living issue, right? One of the issues, Your Honor. But actually more important … But where do you get the idea that this is such a remarkably high standard and it's – you've got to show it's insurmountable? I mean, I think Brewer, Pena, whatever, there's nothing like that. It makes it quite a moderate, reasonable standard. It doesn't, Your Honor. I mean, I would disagree with that assertion. I think that it's clear from the language in itself. It's a minimal standard of living. And that if you look at the adoption and you look at the prongs and how the court's been – how the test has been applied in this circuit and every other circuit, a debtor is not entitled to an average standard of living. No, no, not average. Minimal. But you don't have any insurmountable barriers in proving that it's minimal. In fact, you know, the latest case that I was preparing to find something that's minimal standard said the method for calculating debtors' average monthly expenses is a matter properly left to the discretion of the bankruptcy court. But, Your Honor, this case isn't about a minimal standard of living. That's part of the analysis. But really what this case is about, and I think what Nye discusses, is that the debtor bears the burden of proving insurmountable barriers to repayment. Well, let me try to get at, I think, the same question in a different way. I mean, part of what frustrates me here is that I might well take issue with conclusions reached by the bankruptcy court, but I don't know that I have anything to point to to say that, well, you really could have saved money by living closer to your job, and there are cheaper places to live. I mean, I don't know the greater Los Angeles area, so these points of reference aren't particularly clear to me. But you can figure out, well, gee, this is relatively more expensive than this area, and that's closer. But what was there put before the bankruptcy judge to permit the bankruptcy judge to draw those conclusions if she chose to? See, you keep arguing the burdens on the Petitioner, on the bankrupt, the debtor. That's true, but only to a certain point. And in this case, the bankruptcy court concluded and the district court affirmed that point had been reached. And so I look in here, the Nova review, we're sitting in the seat of the district judge, but basically looking at a factual determination by the bankruptcy court and what is there in the record that would permit me to say, you know, if they didn't live here, they lived there, you could save a substantial amount of money. Is there anything at all in the record that speaks to that? If you look at the record, what you find is this is a family that is only going to increase its income in the future and only going to decrease its expenses. This individual who is a highly educated, healthy individual who has a master's degree in information technology, who's received constant raises of 3 to 4.5 percent every year, his last raise being $2,900. He was currently making almost $70,000 at the time of trial. Did defendant – did your client present any evidence at all? The burden is not on the – I didn't ask that question. I've heard from you where the burden is. And isn't that a problem? The burden may be on the debtor, but if the objecting party chooses to submit nothing, well, then the only question that the Court can look at is, is this stack high enough? Not that there's anything to believe that – I mean, I could speculate. There are places they could live that are cheaper. But if there's nothing in the record, I don't think as a court of appeals I can speculate as to that, because there's simply nothing in the record. Well, obviously, the creditor doesn't have to prove anything if the debtor doesn't meet the initial burden. Well, maybe the debtor is living in the lowest-cost area he could possibly live. I think the record belies that, Judge Reinhart. If you look at it, the Court found that he's living above the IRS guidelines for their family area, which is an average standard of living. No, no. That's not Judge Clifton's question. He said maybe there's an area he could move to that would cost him half as much to live there. If there is, there's no way for us to tell that. The fact is, Your Honor, if the future is cloudy, the debtor has not met its burden to prove it. It's not cloudy. He's living in this area. Nobody says it's not the lowest-cost area. But no one also says it is the lowest-cost. I mean, the important thing is he didn't prove it is the lowest-cost area. The burden is on him to prove it is the lowest-cost. You mean somebody who's living somewhere has to say, prove that all or every single area in Los Angeles is more expensive than that? Not necessarily, Your Honor. But I mean, he carries more of a burden. What he proved with regard to housing was that there is some housing that's more expensive in Valencia. There definitely is. If someone's living at the average standard of living, there necessarily is more expensive housing, and there necessarily is less expensive housing. That's how you get the average. He did not. And what he proved was, is he was living a little above the average. And when you look at this, what you see is — How did he prove that? A little — The Court compared his — What did he — how did he prove that he's living above the average? The Court said that his housing costs were slightly above the IRS collection guidelines for housing for the area. And the IRS collection guidelines, which, unfortunately, many courts are using, is what an average standard of living is, is what the average person spends on certain areas of expenses. And I think the important thing the Court must look at when they're looking at these issues is to understand the fundamental nature of the action, and that this is a dischargeability action. It's an extraordinary request. It's a request by the debtor to be forever relieved of their entire obligation to — No, no, no. No, wait. This doesn't say forever. It just says until the — there's a portion of the time that he's discharged, isn't it? No. This is forever. No. It's not until the youngest child reaches a certain age. That's not forever. Well, part of the problem with that analysis is the fact that he didn't prove the — and part of it is that — You agree it's not forever. That is wrong, that statement. Generally, it discharges forever. But, I mean, in this case, there's nothing to prove. It's not forever. In this case, it's not forever. It may be a semantic difference. You agree, I take it, that the payments that become due during the time period until the child gets to be — the last child gets to be 18, those are gone forever. There is a debt that still remains. The payments that come due after that point, they're still in place and need to be repaid by the debtor. Isn't that correct? You don't know? I don't know. Honestly, I don't know from the judge's work. Because this is not — when a court gets — when a court gets these opinions, what they're supposed to do is look at it and apply the task and either discharge the loans or they don't discharge the loans. They have to do one or the other. And the fact of the — and the problem with the Court's analysis is, is that obviously as each debtor — there's no point in waiting for the last child to become 18, because as every child becomes 18, the expenses necessarily go down. It sounds to me — I got to tell you, it sounds to me — you want to argue a theoretical case hoping to get case law that talks about a high burden. But the case you've got in front of us has a judgment that you're not aware of. And evidence that just doesn't measure up at all. Defendant doesn't — or creditor doesn't submit any evidence. And so it really becomes hard to say to the bankruptcy court, well, you know, this stack isn't quite high enough when defendant creditor has just opted not to put anything in. To allow the debtor to come in and just say, I have an undue hardship, would be like a software company suing Microsoft for patent infringement and just walking in and saying, they infringed my patents, and then looking at Microsoft and asking them to say, well, why did you infringe the patents? A debtor carries a much greater burden than simply coming in and saying, it's an undue hardship. I've maximized my income. I've minimized the expenses. If the burden of proof means anything, it means they've got to produce something. But even in this case, what they've proved — Well, it's a lot easier to win against a silent defendant. And if you've opted to be a silent defendant, it doesn't give as much of a record to work with. Well, actually, as the First Circuit noted in Waterhouse, the creditor bears no burden of proof, and they can just sit back. And if the debtor doesn't carry its burden, they don't — they can sit silently knowing their loan still shouldn't be discharged. And what this case has is you have the facts. If you look at them, they've proven a current inability to pay based on their current choices. They have over — almost $900 in car payments. There's no way that's a minimal standard of living. The income is only going to increase. It's increased every year. And there's nothing to say that he won't get a new job tomorrow. The fact that he hasn't — Well, the income increases every year, and so does the cost of living. But first off, the increases are merit increases that he's receiving and not cost of living increases. Well, what's the difference? If the merit increase doesn't exceed inflation or the cost of living increase, it doesn't matter what it's for. You call it cost of living, call it merit. Merit means you don't get an automatic one. It doesn't mean that it's larger or more than the rate of — projected rate of inflation or cost of living. Well, it's not just the cost of living. There are other things that they can do to increase their expenses or increase their income. There is no insurmountable barrier to Mr. Manigaume from working. Would you tell me the case that says you have an insurmountable barrier? Nye's, Your Honor. Nye's? One last year. Henry Nye's. All right. Yourself, Judge Pays, and Judge Tallman were on the panel. And the insurmountable barrier language nears what every other circuit court has said about student loans. Like, again, as I said, there must be a certainty of hopelessness. The debtor bears the burden. They must do something more than simply come in and show tight finances, because if that's the standard, then every debtor who goes through bankruptcy will be entitled to an undue hardship discharge. And as Congress has made it clear, that the dischargeability of student loans is meant to be an exception, not the rule. As the Fourth Circuit and Prusher said, the — if every debtor, if just simply being unable to pay your debts is the basis, then every debtor will be able to have a discharge and the exception will swallow the rule. But just going back to the nature of the action, it's dischargeability versus repayment. And I think that the — Is Nye's settled in your brief? Actually, Nye's came out after — just came out just last year, Your Honor. Is there a particular part of Nye's which went at 946? The one thing I want to talk about, Your Honors, is that the fact that you have to look at this whole program and the whole scheme of things. Dischargeability, as I said, was about the ability to discharge the obligation. It's not about repayment. Though repayment is often a consideration, the objects of both are very, very different. So, for example, if this Court were to reverse the discharge of Mr. Manigomi's loans, he is not going to be forced to involuntarily make a payment tomorrow that he can't afford. Rather, if he doesn't make a voluntary payment, at some point in time, the loans will be assigned to a guarantee agency who will be required to administratively garnish his wages. And if that 15 percent of his disposable pay imposes a financial hardship on him, then he can request a hearing and ask for that to be reduced. And significantly, the hearing officer will judge his request based on an average standard of living. It will use the IRS collection guidelines. So when it comes to repayment, Congress is entirely consistent with regard to repayment of debts. The IRS regarding tax debts, of course, uses the IRS collection guidelines. The bankruptcy courts use, when deciding the disposable income test, the IRS collection guidelines. And when it comes to repayment of student loans, hearing officers use the IRS collection guidelines. And it's appropriate to use a standard, average standard of living when it comes to repayment in that context. What's inappropriate is a bankruptcy court imposing the financial hardship standard in the undue hardship context. Undue hardship was meant to be an incredibly high burden placed by Congress because of the nature of student loans and the fact that if the loans are discharged, it is the taxpayers and future student loan borrowers that bear the cost of those loans. And just to go back to some of the facts of this case, and I don't think we've gone over them, is that there's nothing in the facts that show any insurmountable barriers or certainty of nonpayment. The word insurmountable, does that appear in Nye's any place? The firm's Your Honor? Insurmountable. We've heard that. They use the phrase – this Court in Nye's used the term insurmountable barriers. Where is it? It says on 946, the circumstances need be exceptional only in the sense that they demonstrate insurmountable barriers to the debtor's financial recovery and ability to pay. Thank you. And in this case, the debtors have proved no insurmountable barriers. There's nothing that would stop Mr. Mandigomi from getting a better job. There's nothing that's going to stop him from getting raises every year. In fact, he's going to get raises every year. There's no insurmountable barrier to the wife getting a job. There is no insurmountable barrier to them reducing their expenses. In fact, if you look at this case, all you see is income going up and expenses going down for this family. The basis for most of their expenses are their children. And as their children leave, they can get smaller, less expensive housing. Obviously, once the car payments are gone, that $900 a month is not a constant payment. And the Court would err in thinking that a car payment is going to be a constant payment. Obviously, when the payments are gone, that amount will be greatly reduced. And as Mr. Mandigomi pointed out, he already bought reliable transportation. Obviously, the maintenance expenses are not going to be as significant as $900 a month. And you also must look at the background. This is a family that, before they had an Explorer, was driving a Ford Expedition, the largest SUV you can possibly drive. If you look at their tax returns. The insurmountable circumstances language has to do with the additional circumstances. Is it going to continue forever? Absolutely, Your Honor. The same case, Nye, when it applies the test, says, however, the debtor may rebut the presumption with additional circumstances indicating that her income cannot reasonably be expected to increase and that her inability to make payments will likely persist throughout a substantial portion. Exactly, Your Honor. Likely persist. Now, that doesn't mean you've got to prove with certainty. It's not that kind of a barrier. Whatever. You've got to show that there are no additional circumstances. And exactly. But if the debtor shows that it's likely she'll continue to have the same problem, that's enough. I would agree, Your Honor. As in Pena. This Court, when it looked at Pena, obviously, you had a wife who couldn't work because she had mental disabilities and a husband whose income wouldn't increase. But here what you see is a debtor whose income is only going to increase. It's absolutely. The testimony, the uncontroversial testimony from the debtor is that it is going  Not very much. Not very much. Was it $3,000 a year? 3 or 4 percent. $3,000 a year is very significant, Your Honor. And I think that if you're already looking at someone who makes $70,000. He's paying rent, which is likely to increase, and has all the other living problems where the cost is likely to increase. Not necessarily, Your Honor. As the largest base of their expenses is their food budget and their housing expense. As the children leave, they don't need a 2,200-square-foot house for a husband and wife and two kids. They're not going to have $900 a month in car payments. This is also a family student. And doesn't the judgment speak to that, by treating the payments that come due after the children are no longer children, treating those payments differently? The problem with that, though, Your Honor, is that it doesn't look at each child as each child leaves, the necessity for those same expenses decreases. It doesn't wait until the very last child. They don't need a three-bedroom, 2,200-square-foot house until the last child is 18 years old. And that's the problem with the decision. What happens if, let's suppose that the circumstances change? Let's suppose he gets promoted and his income doubles to $140,000 next year. It's too bad? Exactly. He's just discharged. There's no change circumstance, re-opener or anything like that in this program? Well, no. And that's the thing, Your Honor. If next year he makes $140,000, this order still says that you can't collect on him. I mean, there's no – and that's the point, is that the debtor has to prove there's certainty of hope. These are incidental barriers. That's – you answered my question. I don't need all this. You're well over time. And if the Court – if I can just finish my last thought, Your Honor. Well, he's running it. Judge Reinhardt? Oh. One last thought. If the Court affirms the discharge in this case based on the facts, it's difficult to see how any debtor wouldn't meet the undue hardship standard. The insurmountable barriers, instead of being the wall that Congress intended, would become nothing more than a speed bump, and it would greatly reduce the financial integrity of the protection of the financial integrity of the student loan system. Thank you. Thank you. Good morning. My name is Melanie Gardner-Pollock on behalf of the appellees. Counsel, do you face a speed bump or an insurmountable barrier? I would consider the facts of this case to be greater than a speed bump, Your Honor. This is a family of six who, yes, is residing in a 2,200-something-square-foot home in Valencia, but the unrefuted evidence at trial is that this house was available to the debtors because it was at a reduced rental, because the house was in significant disrepair. There was one bathroom that was not functioning at all. There were sparks coming out of the electrical outlets. They converted one of the extra rooms, a non-bedroom, into a bedroom. There was testimony at trial that the debtors looked at apartments to see if the rent would be lower for apartments, but interestingly enough, the apartments were more expensive than this home, which was at the bottom of the market in that area. And again, there was no other evidence of it. Was there any evidence of looking in a different area? There was no evidence of looking in another area, Your Honor. Should they be expected to look in another area? Possibly, Your Honor, but the ---- Are there cheaper areas? Was the commute like 60 miles to where his job is? Are there less expensive residential areas between Valencia and wherever it is he commutes to? I do not know the answer to that question, Your Honor, and there was no evidence to establish that there were any areas that were cheaper. Where was his job? In Buena Park, Your Honor. Buena Park? All the way down toward Knott's Berry Farm? I believe that is the area, and as ---- I can't imagine why anybody would want to live in Valencia and work in Buena Park. Well, as the Court may ---- I mean, maybe it was cheaper there. I don't know what it costs in Buena Park. I don't know the cost either, Your Honor, but there was a point in time prior to the filing of the instant bankruptcy where Mr. Mandegomi's job required him to travel to go on site to the various Jack in the Box locations. He had a company car, so he really did not have to venture to the Buena Park home office. At some point in time, his position did change, requiring him to go to the Buena Park office, and then he no longer had the use of a company car, which is why the debtor's car payments are so significant. They were driving an expedition because they have four children. The 15-year-old at the time of trial, whom was 6'1", weighed 240 pounds, and they needed a car that Mrs. Mandegomi could use to shuttle all four kids to school. When Mr. Mandegomi lost the use of a company car, he had to seek financial assistance from his brother because he didn't qualify to buy another car. He couldn't come up with a lump sum. He couldn't qualify for refinancing. The problem I have with this case is that, aside from the fact that the creditor didn't give us much to work with except trying to refute what you're coming up with, but a lot of this seems transitory. First of all, you just said his circumstances changed because Jack in the Box changed his assignment. I don't know what the Explorer's cost, but they aren't necessarily the cheapest SUV on the road, and I don't know whether he's getting a new one or a used one. So the problem I have is that he's not unemployed. He's maybe underemployed, but he is getting bonuses. He is getting raises. And this discharge lets it run until the age of his youngest son. How long is that into the future? It's eight years from the time of trial, Your Honor. So at eight years. So he's got basically an eight-year window. And has anybody done the math of how much of his loan will still be outstanding at that time? Yes, I believe the trial court did and estimated that based on Judge Thompson's testimony, the principal will have been paid off, but there may be penalties and interest that remain that will be required to be paid off at that time. So what is he looking at at exposure when the window closes and he has to start being financially responsible again? I don't know that anyone has done that actual calculation. I do not have those numbers. If I may answer the Court's question about the Explorer, the testimony was that Ford was the only company that was willing to finance these debtors because they had previously been financed from Ford. And the Explorer was not new, and it was one of the only vehicles that could accommodate the four children plus Mrs. Mandagomi to transport them to school. You don't think a Toyota Highlander would work? I don't know the size of the Highlander, Your Honor, but I know from my ---- I guarantee it gets four kids. I believe that the Toyotas are more expensive than the Ford, and Ford is more lenient in credit worthiness. We don't disagree. What happens if all of this changes and he's no longer working in Buena Park and commuting 60, what is it, 60 miles, an hour and a half each way? It is approximately 60 miles, Your Honor, and I don't know what happens. I wouldn't even imagine to speculate. Could he win the lottery tomorrow? Of course he could. No, no, no, no, no, no. That's not the same analogy. We're talking about a history of his employer having transferred him. He's in a management position, correct? Yes, he is, supervisory. So he's subject to transfer. Well, he testified at trial that although there may be lateral moves within the company, the only advancement was to the position of general manager, which would be an advanced salary, but that position had been maintained by someone else for approximately 10 years, and he didn't believe that. Which is the only company you can get employment with? He believed so, as he had for approximately seven years sent out resumes, made phone calls, and got very few invitations for interviews and not one offer. Now, what was hard about this case is that the income of this family isn't at poverty level or anything close to that. The basic attack being made by the creditor is that the court took average or mistook average for minimal. And so you can say this is an average, maybe slightly deprived, middle-class existence, but the law requires proof that you can't survive at a minimal standard. And the creditor elected not to try to put any evidence in that gives the court, the bankruptcy court, or for that matter us, a standard of comparison. But just the basic numbers seem kind of large to say that, well, this is minimal. Because it seems to me there are an awful lot of people in the Los Angeles area that could buy an income less than that, and we expect them to. Now, the creditor is posing that as a test of the burden. That is, it is the burden of the debtor to demonstrate undue hardship as against this minimal standard of living. The district court, the bankruptcy court and district court concluded that you have met that challenge, but I think the broad question is, take a step back. Is this really a minimal standard of living that's been proved? I believe the question, Your Honor, is not whether or not the debtors are living a minimal standard of living at the present. The question is whether or not if required to pay, repay the student loan, would they still be able to maintain a minimal standard of living for themselves and their dependents. But the Court's analysis appears to define what they're at now, doesn't try to make any significant change in their living conditions, for example. By not requiring them to move to a smaller place, the Court appears to have accepted this as a definition of minimal. By not considering the possibility of living in a different area, the Court appears to have accepted this as a demonstration of minimal. Now, you could say, as I've suggested to creditors' counsel, that maybe a creditor could stick some evidence in here and speaks to the issue. But the challenge being put by the creditor is the burden of proof one. If your client has a burden of proof to demonstrate it would be undue hardship, have you done that really by saying we can't make ends meet living the way we live now? Because I don't see any evidence from your client that really shows contemplating major changes. In particular, there's nothing at all that speaks to living in a different area. The given appears to be we're living in Valencia. Is that enough under the burden of proof and the obligation that's put on your client to show that it would be undue hardship? I think that it is, Your Honor, because although they do live in Valencia and they did not look for housing outside of Valencia, they are living in a substandard house. Within Valencia? Yes. Is there anything whatsoever in the record either way that speaks to what they're paying as compared to what other people in the Los Angeles metropolitan area pay for housing? No, Your Honor, there isn't. But I think what's important to also recall is that the debtors are functioning at a deficit currently with the assistance from the brother. Same premise. They're operating a deficit where they live now, paying the rent they pay now. But we have zero information about what other rents might be available to them. Yes, I don't have any information on other areas. Okay. So I can fault the creditor for not having submitted something to challenge that. But let me go back to the issue that the creditor raises, which is the burden of proof is explicitly put on your client to demonstrate it would be undue hardship. And if there is zero evidence with regard to what other areas or what rentals might be available in other areas that he surely has to drive by to get to his job, can we fairly say he's carried the necessary burden? I think that you can in considering all of the circumstances, because although the rent is, I believe it was $2150, living in this general area, I can't imagine how much less a rental property would be that would house six people. If the law is such that a family of six needs to live in a two-bedroom apartment where children of the same gender share a bedroom, I think then the pendulum has swung too far to the right. The debtors have indicated that their expenses, aside from housing, are at the minimal levels. They're below the national standards for food and clothing. Their budget does not even provide any expense for retirement, for medical visits over and above one copayment per month. There's no life insurance. I think if you look at the entire picture of their budget, how they've maximized the income and minimized the expenses, I think they have met their burden under each prong. They are at fault for not establishing that they looked in other areas, but I think it's reasonable to infer, in Southern California at least, even in Buena Park, you're not going to find housing for a family of six for much less than $2150. Well, maybe you wouldn't watch. Maybe you should have moved there. Thank you, counsel. Your time's up. Thank you, Your Honor. Your Honor, I see I've used up my 10 minutes. If I could just ask you a question. I'm sorry. Let me ask you a question. Are you aware of any case in which the Court has said that it's the debtor's burden to show that where he lives is too expensive or that they — well, that if he moved to another area, he could pay less? Well, Your Honor, many cases say the debtor has the burden of proof until he's minimized his expenses. Now, come on. Are you going to answer the question or not? Are you aware of any case that says that it's the burden of the debtor to show that the place he lives is not — is not more — is not less expensive than the other areas of the community? Yes. There's, in fact, case law that says a debtor doesn't have to get a roommate to reduce their housing expenses. Okay. You're not going to answer the question. Thank you. Just one point, Your Honor, is that I think part of the analysis needs to look forward as opposed to just currently at the present, and that's the biggest part of the undue hardship analysis. Good. That's the additional circumstance. Thank you. All right. Thank you. The case is just arguably submitted.
judges: Reinhardt, Fisher, Clifton